## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JULIE KIMBALL, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC., VOLKSWAGEN AKTIENGESELLSCHAFT, AUDI AKTIENGESELLSCHAFT and AUDI OF AMERICA, INC.,<br><br>Defendants. | Civil Action No. |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Julie Kimball alleges on her behalf and on behalf of the class as follows:[1]

### INTRODUCTION

1.       Plaintiff Julie Kimball (hereinafter "Kimball" or "Plaintiff") initiates this class action against Volkswagen Group of America, Inc. (hereinafter "VWGoA"), Volkswagen Aktiengesellschaft (hereinafter "VWAG") (hereinafter together "VW"), Audi Aktiengesellschaft (hereinafter "Audi AG"), and Audi of America, Inc. (hereinafter "Audi America") (hereinafter together "Audi") (hereinafter collectively, "Defendants"), individually and on behalf of all persons in the United States who purchased certain 2009 through and including 2014 model year VW or Audi vehicles as defined *infra* at ¶ 12 (hereinafter "class vehicles") incorporating the engine with

---

[1] These allegations are based on plaintiff's personal knowledge as to her conduct and as to all other matters based on counsel's investigation. Counsel's investigation includes an analysis of publicly available information, including Defendants' Technical Service Bulletins, National Highway Traffic Safety Administration documents and consumer complaints, as well as expert analysis of the defective and redesigned turbochargers, field investigations conducted by counsel and additional analysis. Plaintiff's counsel believe that a reasonable opportunity for discovery will provide further support for the claims alleged here.

a defective turbocharger (hereinafter "class engine(s)") for Defendants' violations of common and statutory law and concealment of a known defect in the class vehicles.

## PARTIES

2.      Plaintiff Kimball is a citizen of the State of California and resides in Kentfield, California.  On or around December 2009, Plaintiff Kimball leased a 2010 Audi A4 equipped with a class engine in California from an authorized Audi dealership for her personal or household use. At the expiration of the lease, Plaintiff Kimball purchased the 2010 Audi A4.  On or around July 2019, at 63,683 miles, Plaintiff Kimball' vehicle experienced the turbocharger defect.  As a result of the turbocharger defect, Plaintiff Kimball was forced to pay approximately $3,000.00 to have her vehicle diagnosed and the turbocharger replaced.

3.      Defendant VWGoA is a New Jersey corporation doing business throughout the United States, including California.  VWGoA's corporate headquarters is located in Herndon, Virginia.  VWGoA is a wholly-owned U.S. subsidiary of VWAG.  VWGoA engages in business activities in furtherance of the interests of VWAG, including the advertising, marketing and sale of VW automobiles nationwide.

4.      Defendant VWAG is a German corporation with its principal place of business in Wolfsburg, Germany.  VWAG is one of the largest automobile manufacturers in the world and is in the business of designing, developing, manufacturing and selling automobiles.  VWAG is the parent corporation of VWGoA and Audi AG.

5.      Audi AG is a German corporation with its principal place of business in Ingolstadt, Germany and is a wholly-owned subsidiary of VW AG.  Audi AG is the parent entity of Audi America.  Audi AG designs, develops, manufactures, and sells luxury automobiles under the Audi brand name.

6.     Audi America is a Delaware corporation with its principal place of business located in Herndon, Virginia.  Audi America is a wholly-owned subsidiary of Audi AG and an operating unit of VWGoA.  Audi America engages in business, including the advertising, marketing and sale of Audi automobiles nationwide.

7.     At all relevant times, VWGoA and Audi America acted as authorized agents, representatives, servants, employees and/or alter egos of VW AG and Audi AG while performing activities including but not limited to advertising, warranties, warranty repairs, dissemination of technical information and monitoring the performance of VW and Audi vehicles in the United States, including substantial activities that occurred within this jurisdiction.

8.     At all times relevant to this action, Defendants manufactured, distributed, sold, and warranted the class vehicles under the VW and Audi brand names throughout the United States.  Defendants and/or their agents designed, manufactured, and/or installed the turbocharger in the class vehicles.  Defendants and/or their agents also developed and disseminated the owner's manuals and warranty booklets, USA Warranty and Maintenance schedules, advertisements, and other promotional materials relating to the class vehicles.

**JURISDICTION AND VENUE**

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000.00 and is a class action in which there are more than 100 members.  Members of the proposed class and/or subclasses (as defined below) are citizens of states different from Defendants and greater than two-thirds of the members of the proposed class and/or subclasses reside in states other than the states in which the American corporate Defendants are citizens.  This Court has jurisdiction over supplemental state law claims pursuant to 20 U.S.C. § 1367 and jurisdiction over the

Magnuson-Moss Warranty Act claim by virtue of diversity jurisdiction exercised under the Class Action Fairness Act ("CAFA").

10.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391(a), (b) and (c) because VWGoA is incorporated in New Jersey and Defendants have marketed, advertised, and/or sold the class vehicles within this district through numerous dealers doing business in the district. Defendants' actions have caused harm to Plaintiff Kimball as well as hundreds of class members residing in New Jersey.   VWGoA and Audi America maintain the following offices and/or facilities in New Jersey: (1) the "VW/Audi VCI Eastern Region" in Woodcliff, New Jersey; (2) the "VW/Audi Test Center" in Allendale, New Jersey; (3) the "Product Liaison Group" in Fort Lee, New Jersey; (4) and the "Parts/Region Distribution Center" in Cranbury, New Jersey.[2] Accordingly, Defendants have sufficient contacts with this district to subject Defendants to personal jurisdiction in the district and venue is proper.

## FACTUAL ALLEGATIONS

11.     Defendants are major manufacturers of vehicles sold under the VW and Audi brands throughout the United States.  Defendants designed, manufactured, imported, distributed, marketed, and/or sold the class vehicles in the United States.  Defendants also provided service and maintenance for the class vehicles through their extensive network of authorized dealers and service providers nationwide.

12.     On information and belief, the turbocharger defect exists in the following VW and Audi 1.8 and 2.0L vehicles: 2012-2014 VW Beetles; 2009-2012 VW CC; 2009-2012 VW Eos; 2008-2012 VW GTI; 2008-2014 VW Jetta; 2008-2010 VW Passat; 2009-2014 VW Tiguan; 2008-

---

[2] *See Volkswagen Group of America Locations*, VOLKSWAGEN GROUP OF AMERICA, https://www.volkswagengroupofamerica.com/locations (last visited April 11, 2022).

2012 Audi A3; 2009-2013 Audi A4; 2009-2013 Audi A5; 2012 Audi A6; 2009-2012 Audi TT; and, 2011-2012 Audi Q5.

13.     Plaintiff and members of the proposed classes (and/or subclasses to be determined) (defined *infra* at ¶ 112 ) purchased and/or own class vehicles.

14.     Plaintiff and members of the classes had to pay thousands of dollars to replace the defective turbocharger and causing Plaintiff and members of the proposed classes and/or subclasses to overpay for their class vehicles at the time of sale.

15.     Defendants wrongfully and intentionally concealed a defect in design, material, manufacturing, and/or workmanship in the class engine turbocharger (hereinafter "turbocharger defect"), which can prematurely fail at any time, forcing Plaintiff and members of the proposed classes and/or subclasses to incur out of pocket costs to repair or replace the defective turbocharger. As explained in detail *infra*, the turbocharger fails before the end of the useful life of the engine as the result of defects alleged herein (hereinafter "turbocharger defect" or "defect").

16.     Class engines employ an exhaust-gas turbocharger with a vacuum operated internal wastegate to increase horsepower by harnessing engine exhaust gases to spin an axial turbine and compressor which in turn pre-compresses air "on demand" and supplies it to the engine cylinders for combustion after fuel is injected. *See* Figure 1, *infra* for a depiction of a turbocharged engine layout diagram.  When functioning properly, the class engine turbocharger increases torque and horsepower of class engines on demand.

17.     The function of a turbocharger wastegate is to bleed off excessive air pressure (a/k/a "boost pressure") by the compressor to prevent excessive overboost pressure from accumulating and resulting in likely engine damage. See figure 2, infra, for a depiction of turbocharger wastegate layout diagram.  Class engines use a metal linkage rod to connect the wastegate actuating arm

(a/k/a "lever arm" or "link plate") to the wastegate control pod that operates on engine vacuum. This linkage assembly controls the opening and closing of the turbocharger wastegate.



FIGURE 1
DEPICTION OF THE LAYOUT OF AN AUTOMOBILE
ENGINE EQUIPPED WITH A TURBOCHARGER



FIGURE 2
DEPICTION OF AN EXEMPLAR INTERNAL WASTEGATE TURBOCHARGER

18.     The exhaust manifold and turbine side of the class engine turbochargers produce pulsations and vibrations that travel through the wastegate valve shaft and wastegate lever arm. These pulsations and vibrations cause premature wear on the wastegate shaft/bushing contact surfaces and on the wastegate lever arm/wastegate actuator rod connections.  A secondary effect is that the pulsations and vibrations cause the roll pin on the turbocharger housing to back out "allowing the wastegate valve and lever to drop into the housing."[3]

19.     Where either condition occurs, the turbocharger requires replacement since the wastegate becomes nonfunctional as either overboost or underboost occur depending on the position of the wastegate and failure mode.   These failures occur shortly after the limited powertrain warranties expire.   A properly functioning turbocharger is crucial to the safe and reliable operation of class vehicles.

20.     Knowledge and technical information concerning the turbocharger defect was in the exclusive and superior possession of Defendants and their dealers and this information was not provided to Plaintiff and members of the proposed classes and/or subclasses.   Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, early consumer complaints made to Defendants' network of exclusive dealers, aggregate warranty and replacement part data compiled from those dealers, repair order and parts data received from the dealers, consumer complaints to dealers and the National Highway Traffic Safety Administration ("NHTSA"), and testing performed in response to consumer complaints, *inter alia*, Defendants were aware (or should have been aware) of the turbocharger defect in class vehicles.  Defendants fraudulently concealed the turbocharger defect and safety risk from Plaintiff

---

[3] VW Tech Tips TT 21-10-02 originally issued July 1, 2010 as updated June 19, 2015 to update model year application accompanying the complaint as Exhibit 1.

and members of the proposed classes and/or subclasses.  Defendants knew, or should have known, that the turbocharger defect was material to owners of the class vehicles and was not known or reasonably discoverable by Plaintiff and members of the proposed classes and/or subclasses before they purchased class vehicles or before the warranties on their class vehicles expired.

21.     Defendants had actual knowledge that design, manufacturing, materials and/or workmanship defects were causing the turbocharger defect shortly after production of the class vehicles commenced.  Defendants engaged in extensive field research and quality investigations and analysis before designing and issuing specifications for the turbocharger linkage anti-rattle retaining clip, bidding/sourcing the clip and manufacturing and distributing the new part, which was intended to augment the linkage previously determined to be defective.  These activities took approximately one year before the retaining clip was released for sale.  Defendants have and continue to be under a legal obligation pursuant to federal law to monitor defects that can cause a safety issue and report them within five (5) days of learning of them. *See*  Reporting of Information and Documents About Potential Defects Retention of Records That Could Indicate Defects for NHTSA, 67 Fed. Reg. 45822 (July 10, 2002) (*amending* 49 U.S.C. § 30166(e) (1994)).  Passenger motor vehicle manufacturers (including the Defendants) are obligated to maintain sufficient systems to track reports of defects.  Defendants therefore assiduously monitor the NHTSA–ODI website and the complaints filed in order to comply with their reporting obligations under federal law.  Defendants acquired knowledge of the turbocharger defect prior to and/or within the express warranty time and mileage limitations through these NHTSA–ODI website complaints.

22.     Defendants acknowledged the turbocharger defect in several Tech Tips, Technical Bulletins and Technical Service Bulletins, prior to the purchase of the vehicle by Plaintiff, which described the issue to their exclusive network of dealerships beginning in or around July 1, 2010.

*See* VW Tech Tips TT 21-10-02 accompanying the complaint as "Exhibit 1" discussing the roll pin issue affecting the turbocharger wastegate released July 1, 2010 and updated June 19, 2015. Technical Bulletin 21 10 01 released on August 25, 2010 discusses the wastegate lever arm/wastegate actuator rod connection rattle. *See* Technical Bulletin 21 10 01 accompanying the complaint as "Exhibit 2."[4]   Defendants also fashioned an attempted remedy to correct the turbocharger defect through installation of a retaining clip designated Part No. 06J145220A on August 27, 2011.  *See* Technical Bulletin 21 13 02 dated December 3, 2013 accompanying the complaint as "Exhibit 3."  This Technical Bulletin superseded an earlier bulletin addressing the identical issue released on August 27, 2011.  Part No. 06J145220A and its installation location are depicted in Figure 3, *infra*.  Although this clip may have partially alleviated the rattle noise at the wastegate lever arm and actuator rod connection causing customer complaints, the clip did not stop the continuing premature wear of these components at their attachment point that result in wastegate malfunction.

23.     A further Technical Service Bulletin was released on October 25, 2012 discussing class engine turbocharger engine malfunction light code "PO299 Negative pressure deviation" (turbocharger underboost) and "turbocharger waste gate has play."[5]  *See* Technical Bulletin 21 12 10 2031245/1 accompanying the complaint as "Exhibit 4."

---

[4] What starts out as an annoying a wastegate linkage rattle caused by abnormally premature component wear, eventually causes premature turbocharger failure and expensive attendant replacement costs.
[5] Since class engine turbochargers are not serviceable for excessive wastegate or lever arm play, the entire turbocharger assembly must be replaced.



FIGURE 3
PART NO. 06J145220A AND INSTALLATION LOCATION ON THE CLASS ENGINE
TURBOCHARGER ASSEMBLY AS DEPICTED IN TECHNICAL BULLETIN 21 13 02

24.     Yet another Technical Service Bulletin was released on June 6, 2014 superseding

an earlier bulletin dated July 9, 2013. *See* Technical Service Bulletin 21 14 18 2031245/7

accompanying the complaint as "Exhibit 5."  This bulletin discusses that the "linkage for the waste

gate actuation can encounter excessive wear which leads to play at the waste gate flap" resulting

in "Negative Pressure Deviation" (turbocharger underboost).[6]  *See* Figure 4, *infra*, which is an excerpt from Technical Service Bulletin 21 14 18 2031245/7 depicting the worn wastegate link plate (a/k/a lever arm).[7]



**Figure 1**. Worn eye on wastegate link plate allowing excessive play.

FIGURE 4
EXCERPT FROM TECHNICAL SERVICE BULLETIN 21 14 18 2031245/7 DEPICTING
ELONGATED WASTEGATE LINK PLATE EYE (red annotations in original)

25.     The Tech Tips, Technical Bulletins and Technical Service Bulletins discussing the class engine turbocharger demonstrate long-standing knowledge of the wastegate problem. Defendants were aware that 2010 model year class vehicle engine turbochargers were defective as described in this complaint and would fail shortly after the power train warranty expired.  This is demonstrated by engineering lead times required for component testing, redesign and

---

[6] There appear to be other additional materials generated by the Defendants discussing the turbocharger defect that are not currently publicly available according to reputable industry sources.

[7] All of the various Tech Tips and bulletins that were updated were done so to capture additional subsequent model year class vehicles as those vehicles accumulated sufficient miles for the turbocharger defect to manifest in failure.

manufacturing.  The defective turbocharger wastegate linkage was subsequently redesigned in the 2015 and later model year vehicles by adding an adjustable and more durable rod end fork with a large diameter bushing. *See* Figure 5, immediately below.



FIGURE 5
2015 VW IS38 TURBOCHARGER LINKAGE ROD END FORK

26.     Despite this pre-sale knowledge, the Defendants never informed Plaintiff or prospective purchasers of class vehicles that the turbocharger was subject to premature failure shortly after the warranty expired and would require expensive replacement (or a new engine if the turbocharger failed in overboost and destroyed the engine).  In some instances, class vehicle turbocharger failures occurred with vehicles having as few as 40,000 miles.  The Defendants concealed this expensive turbocharger maintenance cost from the general public and specifically class vehicle purchasers while informing their authorized dealerships and factory-trained mechanics of the defect.

27.     The turbocharger defect presents a significant safety risk for Plaintiff and members of the proposed classes and/or subclasses because when the turbocharger suddenly and unexpectedly fails, class vehicles lose engine power which causes a significant and sudden loss in the ability to accelerate and maintain speed.  Occupants of the class vehicles are at risk for rear-end collisions and other accidents as a result of Defendants' failure to disclose the existence of the turbocharger defect and corresponding safety risk.

28.     Despite Defendants' long-standing knowledge of the turbocharger defect, Defendants never disclosed to Plaintiff and class members that the turbocharger defect exists or that drivers and occupants of the class vehicles are at risk.  Notwithstanding the fact that the turbocharger should operate normally in vehicles for a minimum of 120,000 miles[8], on information and belief, Defendants refused to repair or replace the turbocharger outside of the time periods covered by the respective manufacturers' warranties.  Defendants have wrongfully and intentionally transferred the cost of repair and/or replacement of the turbocharger to Plaintiff and class members by fraudulently concealing the existence of the turbocharger defect which Defendants know will typically occur shortly after the expiration of the class vehicle warranties. Turbocharger repairs cost upwards of approximately $2,800.00 depending on the model and year of the class vehicle.

29.     Class vehicles are equipped with class engines that incorporate the turbocharger defect.  As a result of the defect, these engines are prone to premature failure due to the defective turbochargers and before the end of the useful life of the engine which is in excess of 120,000

---

[8] *See* Exhibits 6 and 7, 2010 model year Volkswagen and Audi scheduled maintenance intervals, respectively.

miles.  Defendants designed, manufactured, imported, distributed, marketed and/or sold class vehicles with the turbocharger defect.

30.    Based on Defendants' representations in the USA Warranty and Maintenance schedules for the class vehicles, the class engine turbocharger is expected to last for the useful life of the engine or at least 120,000 miles without the need for maintenance, repair or replacement. Owners of class vehicles were provided Owner's Manuals and USA Warranty and Maintenance schedules that do not show any turbocharger inspection or maintenance within the first 120,000-125,000 miles.[9]  Indeed, the class engine turbocharger is omitted from the maintenance schedules in Volkswagen and Audi models entirely.

31.    Defendants provide warranty coverage for class vehicles under one or more manufacturer's warranties.  For illustrative purposes, Defendants provided: (1) a New Vehicle Limited Warranty that includes "virtually bumper to bumper coverage for 3 years or 36,000 miles, whichever occurs first" or 4 years or 50,000 miles, whichever occurs first; and/or (2) a Powertrain Limited Warranty for "5 years or 60,000 miles whichever occurs first" which covers "all internal [engine] parts."  Under warranties provided to members of the proposed classes and/or subclasses, Defendants promised to repair or replace defective class vehicle engine components arising out of defects in materials and/or workmanship, such as the turbocharger defect, at no cost to owners of the class vehicles.  These warranties were provided in class vehicle window labels, owner's manuals and brochures, and advertised on Defendants' websites.

32.    Defendants breached their express and implied warranties through which they promised to, *inter alia*, (1) provide class vehicles fit for the ordinary purpose for which they were

---

[9] *See, e.g.*, Exhibit 6 (summarizing maintenance schedule and not showing any scheduled turbocharger maintenance for 120,000 miles for VW vehicles); *see also* Exhibit 7 (not showing any scheduled turbocharger inspection for 125,000 miles for Audi vehicles).

sold; and (2) repair and correct manufacturing defects or defects in materials or workmanship of any parts they supplied, including the turbocharger. Since the turbocharger defect was present at the time of sale of the class vehicles, Defendants were required to repair or replace the turbocharger under the terms of the warranties. Given the latent nature of the turbocharger defect, Defendants knew or should have known that the majority of turbocharger failures likely would occur outside of the warranty periods and have wrongfully transferred the costs of repair or replacement to Plaintiff and members of the proposed classes and/or subclasses through Defendants' fraudulent concealment of the defect. These costs are significant and range in the thousands of dollars. No reasonable consumer expects to incur such costs during the useful life of the engine, especially given Defendants' representations in the USA Warranty and Maintenance schedules provided to vehicle owners.

33.     Knowledge and information concerning the turbocharger defect was in the exclusive possession of Defendants and their dealers, who possessed superior knowledge and was not provided to Plaintiff and class vehicle owners, who could not reasonably discover the turbocharger defect through due diligence. Based on pre-production testing, design failure mode analysis, manufacturing principles, and consumer complaints to dealers, *inter alia*, Defendants were aware of the premature failure of the turbocharger in the class vehicles and fraudulently concealed the turbocharger defect from Plaintiff and members of the proposed classes and/or subclasses. Nonetheless, despite Defendants' knowledge, they continued selling defective vehicles, failed to disclose the existence of the turbocharger defect to Plaintiff and members of the proposed classes and/or subclasses, have not issued a recall, service action or extended warranty and have not remedied the turbocharger defect and/or compensated class vehicle Purchasers or owners for this material class engine defect.

34.     Defendants misrepresented the standard, quality, and/or grade of the class vehicles and knowingly, actively, and affirmatively concealed the existence of the turbocharger defect to increase profits and decrease costs by selling additional class vehicles and transferring the costs of repair or replacement of the turbocharger to owners of the class vehicles, including Plaintiff and members of the proposed classes and/or subclasses.

35.     Plaintiff and members of the respective class and subclasses assert claims against Defendants for violation of California consumer fraud and unfair and deceptive trade practices statutes, negligent misrepresentation, breach of express and implied warranties, violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*., and unjust enrichment.

36.     Defendants knowingly omitted, concealed and suppressed material facts concerning the turbocharger defect and its corresponding safety risk and misrepresented the standard, quality, and/or grade of the class vehicles which directly caused harm to Plaintiff and members of the proposed classes and/or subclasses.  Defendants' wrongful conduct harmed owners of the class vehicles.  Plaintiff and members of the proposed classes and/or subclasses are entitled to damages and injunctive and declaratory relief because of Defendants' conduct.

37.     As a direct result of Defendants' wrongful conduct, Plaintiff and members of the proposed classes and/or subclasses suffered damages, including, *inter alia*: (1) deprivation of the benefit of their bargain by overpaying for the class vehicles at the time of sale; (2) out-of-pocket expenses for repair or replacement of the class engine turbocharger, other engine parts or the entire engine; (3) costs for future repairs or replacements; (4) sale of their class vehicle at a loss; and/or (5) diminished value of their class vehicles.

38.     Defendants are major manufacturers of vehicles sold under the VW and Audi brands throughout the United States.  Defendants designed, manufactured, imported, distributed,

marketed, and/or sold the class vehicles in the United States.  Defendants also provided service and maintenance for the class vehicles through their extensive network of authorized dealers and service providers nationwide.

39.     Plaintiff and members of the proposed classes and/or subclasses purchased and/or own class vehicles.  Class vehicles are equipped with EA888 and EA113 engines incorporating the turbocharger defect.  Plaintiff and members of the proposed classes and/or subclasses had to pay thousands of dollars to replace defective turbochargers which resulted in Plaintiff and members of the proposed classes and/or subclasses to overpay for their class vehicles at the time of sale.

40.     Based on Defendants' representations in the USA Warranty and Maintenance schedules provided with the class vehicles, the class engine turbocharger is intended and is reasonably expected to last for the useful life of the engine of at least 120,000 miles without the need for inspection, repair or replacement.  For example, the 2010 Volkswagen maintenance schedule does not require maintenance of the turbocharger within 120,000 miles (the highest number of miles shown in the maintenance schedule) and the 2010 Audi maintenance schedule (for all models) does not require maintenance of the turbocharger until beyond 125,000 miles (the highest number of miles shown in the maintenance schedule).  *See* Exhibits 6 and 7, 2010 model year passenger vehicle VW and Audi maintenance schedules, respectively.  Failure of the class engine turbocharger occurs prematurely and before any reasonable consumer would expect the failure to occur.

41.     Defendants continued to use the same or substantially similar defective turbocharger components in class vehicles despite knowledge of the turbocharger defect. Defendants intentionally failed to disclose to Plaintiff and members of the proposed classes and/or

subclasses that installation of the turbocharger linkage retaining clip would not cure or prevent the turbocharger defect but would merely lessen the wastegate linkage rattle.

42.     In addition to the TSBs and other evidence of Defendants' knowledge of the turbocharger defect, Defendants acquired knowledge of the turbocharger defect from to consumer complaints such as those made to the NHTSA, which Defendants monitor as part of a continuous legal obligation to identify potential defects in their vehicles.[10]

43.     Consumers who purchased class vehicles filed numerous complaints with NHTSA reporting the turbocharger defect, reporting the need to pay exorbitant amounts to repair or replace the turbocharger, and detailing their experiences of catastrophic engine failure, which places the safety of drivers and their passengers at risk.

44.     Federal law requires VW and Audi to monitor defects that can cause a safety issue and report them within five (5) days.  *See* 67 Fed. Reg. 45822.  This regulation requires manufacturers like VW and Audi to maintain sufficient systems to track reports of defects.  VW and Audi regularly monitor NHTSA complaints and track those reports in a system to meet its reporting requirements under federal law and acquired additional knowledge of the turbocharger defect prior to and/or within the express warranty time and mileage limitations through these complaints, *inter alia*.

---

[10] NHTSA-ODI does not share complainants' personal information with the general public.  A complaint is added to a public NHTSA database only after NHTSA removes all information from complaint fields that personally identify a complainant.  NHTSA-ODI complaints are made by individuals who must identify themselves, enter detailed contact information and vehicle information (including an accurate VIN) before the complaints are reviewed and analyzed by NHTSA.  There are penalties for submitting false statements.

45.    Since the majority of complaints are made directly to Defendants' authorized dealerships, it is reasonable to infer Defendants received, either directly from customers or through their exclusive network of dealers, several times the number of complaints identified here.

46.    Despite these complaints, Defendants have yet to issue a recall, service action or extended warranty or even inform owners of the turbocharger defect and its safety risk.

47.    Over the last five years, NHTSA has received over numerous complaints concerning the turbochargers in VW and Audi vehicles incorporating the EA888 and EA113 engine.  NHTSA's public website only maintains complaints for the last 5 years. *Safety Issues & Recalls*, NHTSA, https://www.nhtsa.gov/recalls?searchType=KEYWORD (last visited January 2022).  Complaints made beyond that cannot be accessed online but are known to exist through social media reports.

48.    Defendants would or should have had knowledge of this information, as Defendants would have received orders for replacement parts and communications through authorized dealerships concerning these turbocharger complaints and failures.

49.    Given that it is industry practice for vehicle original equipment manufacturers to compare complaint rates to competitor vehicles, Defendants would have been aware that class vehicle turbochargers were experiencing higher failure and complaint rates than competitor vehicles.

50.    Defendants failed to inform class vehicle owners prior to purchase and during the express warranty period that the turbocharger was defective and would fail shortly after the express warranty period expired.

51.    Defendants misrepresented by affirmative conduct and/or by omission and/or by fraudulent concealment the existence of the turbocharger defect in the class vehicles.

52.     Defendants also failed to inform class vehicle owners at the time of purchase that the turbocharger in their class vehicles had been inadequately tested prior to placing the car in production and the time of vehicle sale.

53.     Plaintiff and other class members were informed by representatives of VWGoA that it would not provide assistance in repairing turbochargers or engines because the turbocharger failure occurred outside of the express warranty period.

54.     Defendants refused to fully reimburse or compensate Plaintiff for class vehicle turbocharger repair expenses or provide a suitable substitute or replacement vehicle.

55.     Although their class vehicles' turbocharger failure occurred outside the unilateral express warranty period (which was neither seen nor bargained for prior to purchase), class vehicles exhibited unmistakable symptoms (known only by Defendants) of the turbocharger defect within the express warranty period.

56.     Despite actual and constructive knowledge of the turbocharger defect as described in this complaint, Defendants failed to cure the turbocharger defect within the express warranty period and thereby breached the terms of the express warranty.

57.     Through no fault of their own, Plaintiff and members of the proposed classes and/or subclasses did not possess sufficient technical expertise to recognize symptoms of the turbocharger defect.  This information, however, was well known to Defendants, but not revealed.

58.     Plaintiff and members of the proposed classes and/or subclasses relied upon material misrepresentations, fraudulent statements and/or material omissions of employees and agents of Defendants at the time of purchase, including but not limited to the useful and expected life of class vehicles and the recommended class vehicle maintenance program.

59.     Defendants' misrepresentations and fraudulent statements were received by Plaintiff and members of the proposed classes and/or subclasses prior to and at the point of their class vehicle purchase, including misrepresentations and omissions in the owner's manual and the USA Warranty and Maintenance pamphlets.  The representations created a reasonable belief that the useful life expectancy of class vehicles without a major engine failure was in excess of at least 120,000 miles.  These representations specifically related that the class engine turbocharger was a non-maintenance engine component.

60.     Defendants actively concealed the true reasonably expected duration of class vehicle components, including but not limited to the turbocharger, from the Plaintiff and all class vehicle purchasers.  Defendants intentionally failed to inform class vehicle purchasers that class vehicles incorporated defect in the turbocharger that would cause the turbocharger to prematurely fail within half the reasonably expected useful life of the vehicle.

61.     Defendants intentionally failed to inform class vehicle purchasers that the turbocharger incorporated in class vehicles results in higher operational costs than alternative turbochargers or other competitive technology because the turbocharger defect causes the turbocharger to prematurely fail within the reasonably expected useful life of the vehicle.

62.     Defendants actively and fraudulently concealed the existence of the turbocharger defect (including defects covered under class vehicle warranties concerning materials and workmanship) and that the owner's manual accompanying class vehicles incorporated improper maintenance recommendations and maintenance intervals.

63.     Plaintiff and members of the proposed classes and/or subclasses did not learn their class vehicle was defectively designed and/or manufactured until after their turbocharger failed.

21

64.     On information and belief, authorized Volkswagen and Audi dealers did not have knowledge of and/or were counseled not to admit that any defects existed in class vehicles or that improper maintenance recommendations were incorporated in the owner's manual.  Volkswagen and Audi dealers (who also had a vested financial interest in concealing and suppressing the actual cause of class vehicle failures) improperly blamed class vehicle failures on certain conditions for which Defendants would not be responsible and/or denied the existence of the turbocharger defect.

65.     Defendants had actual knowledge, constructive knowledge and/or should have known upon proper inquiry and testing that class vehicles were defective with respect to the turbocharger, suffered from the turbocharger defect during the warranty period and did not have a normal and/or reasonable useful life before sales of class vehicles commenced in the United States. This information was technical in nature, proprietary and not known by the ordinary consumer or the public, including Plaintiff and members of the proposed classes and/or subclasses.  Plaintiff and members of the proposed classes and/or subclasses were ignorant of this technical information through no fault of their own.

66.     Defendants acted to conceal the turbocharger defect during the warranty period so that repair costs would be shifted to Plaintiff and members of the proposed classes and/or subclasses once the warranty expired and the turbocharger failed.

67.     Although Defendants knew the turbocharger defect in class vehicles caused premature failure of the turbocharger, Defendants knowingly and actively concealed material information from prospective and actual purchasers with the intent to deceive purchasers and promote class vehicle sales.

68.     Defendants' knowledge of the turbocharger defect was derived from warranty claims, claims supervisors, customer complaints, and monitoring of performance of class vehicles

by VWGoA quality assurance employees.  Additionally, the number of replacement components and subsequent component revisions would have placed Defendants on notice of the turbocharger defect in class vehicles.  Knowledge of the turbocharger defect is further imputed to Defendants prior to the sale of certain model year class vehicles because predecessor models using substantially similar turbocharger components were also prematurely failing within their reasonably expected life.  Defendants elected to place into the stream of commerce class vehicles that they knew would be adversely affected by the failure to adequately design and manufacture the turbocharger.

69.     Additional information supporting allegations of fraud and fraudulent conduct is in the control of Defendants.  This information includes but is not limited to technical root cause analyses, communications with class vehicle owners, remedial measures, warranty claims and internal corporate communications concerning how to deal with consumers who claim their class engine's turbocharger was defective.

70.     Material information was fraudulently concealed and/or actively suppressed in order to sell class vehicles to uninformed consumers (including Plaintiff and members of the proposed classes and/or subclasses) premised on affirmations and representations of reliable, high quality, long-life vehicles with low maintenance, inexpensive operating costs, superior performance and durability.  Class vehicles incorporated a known turbocharger defect that would severely affect the useful life of the vehicle.

71.     Defendants (and particularly the sales and marketing executives at VWGoA) advertised and otherwise created the reasonable expectation (including but not limited to scheduled class engine maintenance recommendations) that class vehicles would last over 120,000 miles or ten years before experiencing turbocharger failure.  Material information was fraudulently

concealed and/or actively suppressed in order to protect Defendants' (and authorized vehicle dealers') corporate profits from loss of sales from adverse publicity, to reduce warranty repair costs and to limit VW and Audi's brand disparagement.

72.     Defendants had a duty to disclose the turbocharger defect to class vehicle owners and that the owner's manuals set forth the wrong maintenance recommendations and maintenance intervals.

73.     This duty arose because Defendants knew that there were defects in the class vehicles and inaccuracies in the owner's manuals that affected vehicle operation and safety while class vehicle owners were not, and could not reasonably be, cognizant of these defects and dangers.

74.     Defendants continuously and affirmatively concealed the actual characteristics of class vehicles from Plaintiff and other purchasers.  Defendants breached their affirmative duty of disclosure to class vehicle owners.[11]

75.     Defendants breached express and implied warranties and actively and affirmatively misrepresented, fraudulently concealed and suppressed the existence of the turbocharger defect in class vehicles and omissions in accompanying owner's manual and USA Warranty and Maintenance pamphlet.

76.     The warranties accompanying class vehicles were procedurally and substantively unconscionable under the Uniform Commercial Code § 2-302 and other applicable state warranty laws because of the disparity in bargaining power of the parties, the purchasers' lack of knowledge that class engine turbochargers were defective, the inability of class vehicle purchasers to bargain with Defendants to increase durational warranties, their lack of knowledge, their lack of

---

[11] Since unexpected engine failure is a serious safety issue, Defendants had an affirmative duty to disclose the turbocharger defect together with associated risks.

meaningful alternatives, disparity in sophistication of the parties, unfair terms in the warranty (including but not limited to durational warranties that unfairly favored Defendants particularly where there were class vehicle defects known only to Defendants and the warranty unfairly shifted repair costs to consumers when class vehicles prematurely fail during their reasonably expected life), absence of effective warranty competition, and the fact that class vehicles fail with substantially fewer miles of operation than competitive vehicles from other manufacturers or models substantially similar to the class vehicles without the turbocharger defect.

77.     Given the conduct of Defendants and the design, manufacture, materials and/or workmanship defects in class vehicles (that Defendants knew were inherently defective prior to the time of sale), the durational limitations of the warranties are oppressive, unreasonable and unconscionable because the warranty disclaimers of the proposed classes representative and proposed members of the proposed classes and/or subclasses were neither knowing nor voluntary.

78.     The contractual terms were unreasonably favorable to Defendants since Defendants were fully aware of defects in the class vehicles that substantially reduced the expected useful life of the vehicle.  Plaintiff and members of the proposed classes and/or subclasses were unaware of defects in the class vehicles at the time of purchase.

79.     The bargaining position of Defendants for the sale of class vehicles was grossly disproportionate and vastly superior to that of individual vehicle purchasers, including Plaintiff and members of the proposed classes and/or subclasses.  This is because Defendants knew there were defects in class vehicles.

80.     Defendants included unfair contractual provisions concerning the length and coverage of the express warranty when they knew that class vehicles were inherently defective and dangerous and had been inadequately tested.

81.     Defendants knew defects in class vehicle components would cause certain expensive repair failures within one-half of the useful expected life of the vehicle.  Defendants artificially limited the duration of the warranty period to avoid performing warranty repairs in order to maximize profits through the sale of defective vehicles.

82.     Defendants unconscionably sold defective class vehicles to Plaintiff and members of the proposed classes and/or subclasses without informing these purchasers that the class vehicles were defective and that the turbochargers in their class vehicles should be replaced prior to the expiration of the warranty.

83.     Defendants' conduct renders the vehicle purchase contract so one-sided as to be unconscionable under the circumstances existing at the formation of the vehicle purchase contract.

84.     The durational limitation of the express warranties accompanying class vehicles is unreasonable and unconscionable since Defendants actively concealed known vehicle defects and issued incorrect maintenance recommendations and maintenance intervals.  Plaintiff and members of the proposed classes and/or subclasses had no notice of or ability to detect turbocharger defects.

85.     Defendants restricted the limited power train warranty (including the class engine) duration for class vehicles in an effort to avoid the cost of repairs because they were cognizant of class vehicle defects that existed at the time of sale.

86.     Turbochargers in competitive vehicles manufactured and sold at the time the class vehicles were manufactured and sold ordinarily last longer than warranted by the limited power train warranty accompanying class vehicles.

87.     Defendants are engaged in a continuing fraud concerning the true underlying cause of class engine turbocharger failures.

88.     Defendants failed to adequately test class engines in appropriate consumer environments prior to marketing, distribution and sale.

89.     Defendants' unconscionable conduct precludes any exclusion of incidental and consequential damages or any other limitation of remedies.

90.     Even if class engines do not fail entirely, class vehicle owners have sustained an ascertainable financial loss, including but not limited to overpayment damages at the time of sale, increased maintenance costs for turbocharger inspections, and/or premature replacement of the turbocharger, related parts or the entire engine, and/or substantially reduced engine performance, as well as diminution of the resale value of their class vehicles.

91.     Defendants created an over-all misleading impression through their failure to disclose material information concerning the fact that class vehicles incorporated the turbocharger defect and were accompanied by an owner's manual and USA Warranty and Maintenance pamphlet that incorporated incorrect engine service and maintenance recommendations.  Plaintiff and members of the proposed classes and/or subclasses were deceived by Defendants' conduct as described in this complaint with respect to their purchase of class vehicles.

92.     Defendants violated the consumer protection laws of California with their oppressive and unconscionable conduct described in this complaint including but not limited to their failure to disclose material information that caused ascertainable financial harm to Plaintiff and members of the proposed classes and/or subclasses.

93.     Defendants were under a duty to disclose defects in class vehicles and associated safety risks as described in this complaint but failed to disclose to Plaintiff and members of the proposed classes and/or subclasses the characteristics of class vehicles with respect to defects in violation of the consumer protection laws of California.  Defendants' omissions (that turbochargers

were defective and that this defect constituted a safety risk) deceived purchasers (including but not limited to Plaintiff and members of the proposed classes and/or subclasses). Those disclosure omissions include the fact that class vehicle defects had a significant impact on the value, durability, and future care of class vehicles. This failure to disclose additional information concerning class vehicle defects had the capacity to, and in fact did, deceive purchasers (including Plaintiff and members of the proposed classes and/or subclasses) in a material respect.

94.     If Plaintiff and members of the proposed classes and/or subclasses had been made aware of the turbocharger defects in their respective class vehicles and the attendant ramifications of value, durability, maintenance expenses, safety and care, they would not have purchased the class vehicles or would have paid less for their vehicles since members of the proposed classes and/or subclasses were led to believe that they were purchasing a vehicle that was free of major defects and were not fully informed of the true characteristics and attributes of class vehicles.

95.     Defendants fraudulently, intentionally, negligently and/or recklessly concealed from Plaintiff and members of the proposed classes and/or subclasses defects in class vehicles even though Defendants knew or should have known that information concerning these defects was material and central to the marketing and sale of class vehicles to prospective purchasers including Plaintiff and members of the proposed classes and/or subclasses.

96.     Defendants violated the consumer protection laws of California by failing to inform class vehicle owners at the time of purchase that class vehicles had known defects, that the vehicles would prematurely require major engine repairs and/or prematurely fail with resulting catastrophic failure and/or would have a significant effect on the vehicle's value.

97.     The wrongful conduct of Defendants in violation of the consumer protection laws of California occurred within the limitations period set out in the respective statutes and/or the limitations period is tolled by Defendants' conduct.

**What the Omissions Were:**

98.     Defendants fraudulently omitted to disclose material facts basic to both the purchase and warranty service concerning class vehicles, including information concerning the turbocharger defect, in an effort to deceive purchasers as described in this complaint.  At the time of purchase, Defendants fraudulently omitted to disclose material matters concerning the turbocharger defects in class vehicles, including their impact on future repairs, costs and vehicle reliability.  Defendants fraudulently concealed from Plaintiff and members of the proposed classes and/or subclasses defects in class vehicles even though Defendants knew or should have known that information concerning these defects was material and central to the marketing, sale of class vehicles to prospective purchasers, including Plaintiff and members of the proposed classes and/or subclasses.  Defendants concealed from Plaintiff and members of the proposed classes and/or subclasses during their warranty periods that a defect existed with the turbocharger which could have and should have been fixed during the warranty period, particularly as it was a safety issue, and Defendants' withholding of this material information deprived Plaintiff and members of the proposed classes and/or subclasses of the right to have such defective part replaced for free under the warranty.

**The Person(s) Responsible for the Failure to Disclose:**

99.     Plaintiff and members of the proposed classes and/or subclasses are entitled to the reasonable inference that Defendants' sales, marketing, engineering, and warranty departments and their executives were involved in the omissions.  This is particularly true given Defendants'

recent conduct involving compliance certification and pollution control defeat devices involved in the sale of diesel powered passenger vehicles around the world and particularly in the United States.

**The Context of the Omissions and the Manner in which they Misled:**

100.    Material information was fraudulently concealed and/or actively suppressed in order to sell class vehicles to uninformed consumers (including Plaintiff and members of the proposed classes and/or subclasses) premised on affirmations and representations as described in this complaint.

101.    If Plaintiff and members of the proposed classes and/or subclasses had been informed of defects in their class vehicles, they would not have purchased their respective class vehicles or would have paid substantially less.  If Plaintiff and members of the proposed classes and/or subclasses had been made aware of the turbocharger defects in their respective class vehicles and the attendant ramifications of their respective vehicle's diminution in value, future cost of repairs, durability and care, they would not have purchased the class vehicles since each class member believed they were purchasing vehicles without major defects and were not fully informed of true characteristics and attributes of class vehicles.  If Plaintiff and members of the proposed classes and/or subclasses had been informed of the turbocharger defect during the warranty period, they would have had the defective part replaced under warranty.  Defendants' conduct violated the consumer fraud statutes alleged here and deprived Plaintiff and members of the proposed class and/or subclasses of their warranty remedy.

**What Defendants Obtained through the Fraud:**

102.    Material information concerning class vehicles was concealed and/or actively suppressed in order to protect Defendants' corporate profits from loss of sales, purchase refunds,

warranty repairs, adverse publicity and limit brand disparagement.  Purchasers believed they were obtaining vehicles as having different attributes than described and purchased and were accordingly deprived of economic value and paid a price premium for their class vehicles. Defendants had a uniform policy of not properly disclosing class vehicle defects in order to promote sales and increase profits as described in this complaint.

103.    As a proximate and direct result of Defendants' unfair and deceptive trade practices, Plaintiff and members of the proposed classes and/or subclasses purchased class vehicles and sustained an ascertainable loss, including but not limited to financial harm as described in this complaint.

104.    Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the turbocharger defect and the misrepresentations and omissions alleged here.  Through no fault or lack of diligence, Plaintiff and members of the proposed classes and/or subclasses were deceived concerning the turbocharger defect and could not reasonably discover the latent nature of the turbocharger defect.

105.    Plaintiff and members of the proposed classes and/or subclasses could not reasonably discover Defendants' deception with respect to the turbocharger defect in the class vehicles prior to experiencing a failure and being informed of the reason for the failure.  Within the time period of any applicable statutes of limitations, Plaintiff and members of the proposed classes and/or subclasses could not have discovered through the exercise of reasonable diligence that Defendants were concealing the turbocharger defect.

106.    Class vehicle owners do not possess the requisite technical skills in automotive engineering to discern the design, manufacture, materials and workmanship defects in their

vehicles or the requisite technical skills to surmise the proper vehicle maintenance and maintenance intervals for class vehicles.

107.    Plaintiff and members of the proposed classes and/or subclasses did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing a latent defect and/or that the class vehicles incorporated a turbocharger prone to premature failure or safety risk.  The existence of the turbocharger defect and safety risk were material to Plaintiff and members of the proposed classes and/or subclasses at all relevant times.

108.    At all times, Defendants are and were under a continuous duty to disclose to Plaintiff and members of the proposed classes and/or subclasses the true standard, quality and grade of the class vehicles and to disclose the turbocharger defect and potential safety risk associated with the premature failure of the system.

109.    Defendants knowingly, actively, and affirmatively concealed the facts alleged in this complaint including the turbocharger defect.  Plaintiff and members of the proposed classes and/or subclasses reasonably relied on Defendants' knowing, active and affirmative concealment.

110.    Defendants fraudulently attributed the turbocharger failures to other factors and/or exculpating conditions for which Defendants had no responsibility when, in reality, the turbocharger defect was due to design, manufacture, materials and/or workmanship defects.

111.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

112.     Plaintiff initiates this proposed action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) on behalf of herself and on behalf of the following nationwide class and California subclass(es) (or any other class authorized by the court) defined as follows:

> Nationwide Class: All persons or entities in the United States that purchased a class vehicle (the "Nationwide Class");

> California Class: All persons or entities that purchased a class vehicle in the State of California and all persons or entities in the State of California that purchased a class vehicle (the "California Class");

113.     Excluded from the Nationwide Class and California Class, are Defendants and their parent corporations, subsidiaries and corporate affiliates, officers, directors, employees, assigns, and successors, the court, court staff, Defendants' counsel, and all respective immediate family members of the excluded entities described above. Plaintiff reserves the right to revise the definitions of the various proposed classes definitions based upon subsequently discovered information and reserve the right to establish additional subclasses where appropriate.

**Numerosity of the Class: Federal Rule of Civil Procedure 23(a)(1)**

114.     The proposed classes members are so numerous that individual joinder of all potential members is impracticable under Federal Rules of Civil Procedure 19 or 20.  It is estimated there are in excess of 500,000 class vehicles.  Additional information concerning class vehicles will be obtained through discovery from the Defendants.

**Existence of Common Questions of Law and Fact: Federal Rule of Civil Procedures 23(a)(2) and 23(b)(3)**

115.     Common questions of law and fact exist as to all members of the proposed classes and predominate over any issues solely affecting individual members.  The common and predominating questions of law and fact include, but are not limited to:

(a) Whether there is a defect in class engine turbocharger;

33

(b) Whether the turbocharger installed in the class vehicle engine contains a design defect and/or a defect in material, manufacturing and/or workmanship;

(c) Whether the turbocharger defect presents a safety risk;

(d) Whether Defendants knew or should have known that the turbocharger incorporated in class vehicles was defective and/or prone to premature failure;

(e) Whether Defendants had a duty to disclose the turbocharger defect, that the turbocharger is prone to premature failure, and/or that the turbocharger defect presents a safety risk;

(f) Whether Defendants intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts including the turbocharger defect;

(g) Whether Defendants negligently or falsely misrepresented or omitted material facts concerning the turbocharger defect;

(h) Whether Defendants made material misrepresentations and/or omissions concerning the standard, quality or grade of class vehicles and the turbocharger;

(i) Whether class vehicles were sold with an owner's manual and/or USA Warranty and Maintenance manual that incorporated incorrect inspection and service intervals for the turbocharger;

(j) Whether Defendants breached their express warranties (including but not limited to the powertrain limited warranty) in that class vehicles were defective with respect to the turbocharger design and manufacture, including workmanship and materials;

(k) Whether Defendants breached their implied warranties in that class vehicles incorporate the turbocharger defect and are not fit for their ordinary purpose;

(l) Whether Defendants violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* and/or any other statutory duties under state laws;

(m) Whether Defendants were unjustly enriched by the conduct alleged in this complaint;

(n) Whether members of the proposed class(es) would pay less for a class vehicle if Defendants, at the time of purchase, disclosed the turbocharger defect;

(o) Whether members of the proposed class(es) would have purchased a class vehicle if Defendants, at the time of purchase, disclosed the turbocharger defect;

(p) Whether members of the proposed classes would have had the turbocharger repaired or replaced if Defendants had disclosed, prior to the expiration of the warranty periods, the turbocharger defect;

(q) Whether Defendants actively concealed or omitted material facts from Plaintiff and members of the proposed classes in order to, *inter alia,* sell more class vehicles and/or transfer the costs associated with repair or replacement of the turbocharger and/or the entire engine to Plaintiff and classes;

(r) Whether Defendants committed unfair and deceptive business act practices by failing to inform owners of class vehicles prior to purchase and/or during the post-sale express warranty period that the turbocharger was defective and would fail shortly after the warranty period;

(s) Whether Defendants violated the Song–Beverly Consumer Warranty Act, CAL. CIV. CODE § 1791, *et seq.*;

(t) Whether Defendants violated the California Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.*;

(u) Whether Defendants violated the California Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200, *et seq.*;

**Typicality of Claims or Defenses of a Definable Class: Federal Rule of Civil Procedure 23(a)(3)**

116.    Plaintiff's claims and defenses are typical of the claims and defenses of the class (or subclass) Plaintiff seeks to represent.  Class claims arise out of ownership of class vehicles as defined supra.  Plaintiff and the proposed classes sustained damages arising out of the same illegal actions and conduct by Defendants.  Defendants have no claims or defenses unique to Plaintiff or different from the proposed members of the proposed classes or subclass.

**Adequate Representation: Federal Rule of Civil Procedure 23(a)(4)**

117.    Plaintiff currently owns her class vehicle and has no conflicting interests with any other proposed class member.  The claims of Plaintiff and members of the proposed classes are so interrelated that the interests of members of the proposed classes will be fairly and adequately protected in their absence.

118.    Plaintiff is willing and prepared to serve the proposed classes in a representative capacity with all of the obligations and duties material thereto.  Plaintiff will fairly and adequately protect the interests of the proposed classes and has no interests adverse to or in conflict with the interests of the other members of the classes.

119.    Plaintiff's interests are co-extensive with and are not antagonistic to those of absent class members.  Plaintiff will undertake to represent and protect the interests of absent class members and will vigorously prosecute this action.  Plaintiff has engaged the services of the undersigned counsel.  Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and absent members of the proposed classes.

**Superiority of a Class Action and Predominance of Common Questions: Federal Rule of Civil Procedure 23(b)(3)**

120.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.   Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

121.    Maintenance of a class action in one court is the most economical procedural device to litigate the class vehicle claims for class vehicle owners.   Prosecution of separate actions by individual members of the proposed classes could create risk of inconsistent or varying adjudications with respect to individual members of the classes which would establish incompatible standards of conduct for the party opposing the proposed class(es) as recognized by Federal Rule of Civil Procedure 23(b)(1)(A).

122.    Prosecution of separate actions by individual members of the classes could create risk of adjudications with respect to individual members of the classes which would, as a practical matter, be dispositive of the interests of the other members of the class who are not parties to the adjudications or substantially impair or impede their ability to protect their interests as recognized by Federal Rule of Civil Procedure 23(b)(1)(B).

123.    Class action status is warranted under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to members of the classes predominate over any questions affecting any individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

124.    The class may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the class, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the class.

125.     There is a substantial likelihood that the Defendants will oppose this class action and will further act or refuse to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole impractical as recognized by Federal Rule of Civil Procedure 23(b)(2).

126.     The interest of members within the class in individually controlling the prosecution of separate actions is theoretical and not practical.  The class have a high degree of similarity and are cohesive, and Plaintiff anticipates no difficulty in the management of this matter as a class action.

127.     The nature of notice to the proposed classes is contemplated to be by direct mail upon certification or if such notice is not practicable, by the best notice practicable under the circumstance including, *inter alia*, email, publication in major newspapers and/or on the internet.

**CLAIMS FOR RELIEF**

**COUNT I**

**VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT ("CLRA"),
CAL. CIV. CODE § 1750 *ET SEQ.*
(ON BEHALF OF PLAINTIFF KIMBALL AND THE CALIFORNIA CLASS)**

128.     Plaintiff Kimball incorporates and re–alleges each preceding paragraph as though fully set forth here.

129.     Plaintiff Kimball asserts this count on behalf of herself and members of the California Class.

130.     CLRA "protect[s] consumers against unfair and deceptive business practices." *See* CAL. CIV. CODE § 1760.

131.     Plaintiff and members of the California Class are persons within the context of the CLRA, *see* CAL. CIV. CODE § 1761(d), who purchased class vehicles for personal, family, or household use.

132.    Class vehicles are goods within the meaning of CAL. CIV. CODE § 1761(a).

133.    Defendants violated and continue to violate the CLRA by engaging in unfair and deceptive trade practices, including, *inter alia*: (1) representing that class vehicles have characteristics which they do not; (2) representing that class vehicles are of a particular standard when they are of another; and (3) advertising class vehicles with the intent not to sell them as advertised. *See* CAL. CIV. CODE § 1770.

134.    Defendants further violated the CLRA by failing to disclose within the warranty period, or any time thereafter, the material fact that class vehicles possessed the turbocharger defect and its corresponding safety hazard.

135.    When the turbocharger defect occurs, the vehicle has the propensity to, without notice, lose engine power unexpectedly, and experience an immediate loss of speed or ability to accelerate and/or maintain speed; placing the vehicle at risk for a rear end collision or loss of control.

136.    Defendants also violated the CLRA by actively concealing the material fact that class vehicles possessed the turbocharger defect and its corresponding safety hazard and/or transferring the cost of repair or replacement of the turbocharger defect to Plaintiff Kimball and members of the California Class.

137.    The fact that the turbocharger defect exists in class vehicles and exposes consumers to a corresponding safety hazard is material because Plaintiff Kimball and members of the California Class had a reasonable expectation that class vehicles would not suffer from a defect that may cause catastrophic engine failure and its corresponding safety hazard.

138.    Defendants knowingly and willfully engaged in deceptive and unfair trade practices, including but not limited to, deception, fraud, false pretense, false promise,

misrepresentation and the knowing concealment, suppression and omission of materials facts concerning the class vehicles' turbocharger defect and corresponding safety risk in connection with the sale and/or advertisement of class vehicles. Defendants unconscionably marketed class vehicles to uninformed consumers in order to maximize profits by selling additional class vehicles incorporating the undisclosed defect and corresponding safety hazard.

139.    Defendants    fraudulently,    intentionally,    negligently,    and/or    recklessly misrepresented to Plaintiff Kimball and members of the California Class that the turbocharger in class vehicles would not require maintenance, repair or replacement within its expected life and/or a minimum of 120,000 miles and wrongfully omitted the turbocharger from maintenance schedules.

140.    Upon information and belief, Defendants' decisions to fraudulently, intentionally, negligently, and/or recklessly misrepresent to Plaintiff Kimball and members of the California Class that the turbocharger in class vehicles would not require maintenance, repair or replacement and to fraudulently omit the turbocharger from its maintenance schedules was made in New Jersey.

141.    Information concerning the turbocharger defect as described in this complaint is material to consumers in that the defect results in exorbitant repair or replacement costs, can cause catastrophic engine failure and poses a safety risk.

142.    Defendants' unlawful/wrongful acts and practices affect the public interest and trade and commerce in the State of California and present a continuing safety hazard to Plaintiff and the members of the California Class.

143.    As a proximate and direct result of Defendants' violations of the CLRA, Plaintiff Kimball and members of the California Class suffered premature failure of the turbocharger and/or

engine failure, diminution of class vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

144.    With this filing, and on this count, Plaintiff Kimball and members of the California Class seek an order enjoining Defendants' unfair and deceptive practice.

145.    Defendants' violations of the CLRA were willful and oppressive.

146.    Plaintiff Kimball provided Defendants with notice of their violations of the CLRA pursuant to CAL. CIV. CODE § 1782(a) by certified letter on May 2, 2022.  More than 30 days have passed from such notice without any response to relief demanded in the letter.

147.    Plaintiff Kimball and members of the California Class request judgment against the Defendants and injunctive relief including a declaratory judgment and an appropriate court order prohibiting defendants from further deceptive acts and practices described in this complaint. Kimball and California Class members further request costs and attorneys' fees and all other relief including monetary damages authorized by Consumers Legal Remedies Act together with such additional relief as appropriate and necessary.

## COUNT II

### VIOLATION OF UNFAIR COMPETITION LAW (THE "UCL"), CAL BUS. & PROF. CODE § 17200 *ET SEQ.* (ON BEHALF OF PLAINTIFF KIMBALL AND THE CALIFORNIA CLASS)

148.    Plaintiff Kimball incorporates and re–alleges each preceding paragraph as though fully set forth here.

149.    Plaintiff Kimball asserts this count on behalf of herself and members of the California Class.

150.    The California Business & Professions Code § 17200 *et seq.* (the "UCL") prohibits "any unlawful, unfair or fraudulent business act or practice."

151.    Defendants violated the UCL by engaging in unlawful, unfair and fraudulent business acts or practices.

152.    In violation of the UCL, Defendants employed unfair, unlawful, and deceptive acts or practices, fraud, false pretense, misrepresentations, or concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of class vehicles.  Defendants knowingly concealed, suppressed and/or omitted material facts concerning the turbocharger defect and corresponding safety hazard and misrepresented the standard, quality, or grade of the class vehicles, which directly caused harm to Plaintiff Kimball and members of the California Class.

153.    Defendants actively suppressed the fact of the turbocharger defect's existence in class vehicles and that it presents a safety hazard because of materials, workmanship, design and/or manufacturing defects.  Defendants employed unfair, unlawful, and fraudulent business practices to deny repair or replacement of the defective turbocharger within a reasonable time in violation of the UCL.

154.    Upon information and belief, Defendants' decisions to actively suppress the fact of the turbocharger defect's existence in class vehicles and its corresponding safety hazard was made in New Jersey.  Defendants' decisions to employ unfair, unlawful, and fraudulent business practices to deny repair or replacement of the defective turbocharger within a reasonable time in violation of the UCL were made in New Jersey.

155.    Defendants breached the CLRA, Song-Beverly Consumer Warranty Act, and the Magnuson-Moss Warranty Act as alleged in this complaint in violation of the UCL.

156.    Defendants' unfair, unlawful and fraudulent business practices were likely to deceive a reasonable consumer.  Plaintiff Kimball and members of the California Class had no

reasonable way to know that class vehicles incorporated the turbocharger defect and that class vehicles were defective in materials, workmanship, design, and/or manufacture and posed a corresponding safety risk.  Defendants possessed superior knowledge as to the quality and characteristics of class vehicles, including the turbocharger defect and its associated safety risk, and any reasonable consumer would have relied on Defendants' misrepresentations and omissions as did Plaintiff Kimball and members of the California Class.

157.    Defendants intentionally and knowingly misrepresented and omitted facts concerning the turbocharger defect in class vehicles and its associated safety hazard with the intent to mislead Plaintiff and the members of the California Class.  Defendants knew, or should have known, that class vehicles possessed the turbocharger defect and exposes consumers to a corresponding safety hazard.

158.    Defendants owed a duty to disclose the turbocharger defect and its corresponding safety hazard to Plaintiff and the members of the California Class because Defendants possessed superior knowledge concerning the defect and the corresponding safety hazard.  Defendants also owed a duty to disclose the turbocharger defect because Defendants made partial representations concerning the safety of class vehicles and thus owed a duty to reveal the complete truth to Plaintiff Kimball and members of the California Class.  Defendants had a duty to disclose any information relating to the safety, quality, functionality and reliability of class vehicles because they consistently marketed class vehicles as safe.

159.    Once Defendants made representations to the public concerning class vehicle safety, quality, functionality and reliability, Defendants were under a duty to disclose these omitted facts, because where one does speak, one must speak the whole truth and not conceal any facts which materially qualify facts stated.  One who volunteers information must be truthful, and the

telling of a half-truth calculated to deceive is fraud.  Rather than disclose the turbocharger defect, Defendants engaged in unfair, unlawful, and fraudulent business practices in order to sell additional class vehicles and avoid the cost of repair or replacement of the defective turbocharger and/or the damaged engines.

160.    Defendants' unfair, unlawful, and fraudulent acts or practices, affirmative misrepresentations and/or material omissions concerning the turbocharger defect were intended to mislead consumers and misled Plaintiff Kimball and members of the California Class.

161.    At all relevant times, Defendants' unfair and deceptive acts or practices, affirmative misrepresentations and/or omissions concerning the turbocharger defect and its corresponding safety hazard were material to Plaintiff Kimball and members of the California Class.  When Plaintiff Kimball and members of the California Class purchased their class vehicles, they reasonably relied on the reasonable expectation that class vehicles would be free from defects that pose an unavoidable safety hazard.  Had Defendants disclosed that class vehicles incorporated the turbocharger defect and/or pose an unavoidable safety hazard, Plaintiff Kimball and members of the California Class would not have purchased the class vehicles or would have paid less.

162.    Defendants owed a continuous duty to Plaintiff Kimball and members of the California Class to refrain from unfair, unlawful, and fraudulent practices under the UCL and to disclose the turbocharger defect and associated safety hazard.  Defendants' unfair, unlawful, and fraudulent acts or practices, affirmative misrepresentations and/or material omissions concerning the turbocharger defect and corresponding safety hazard are substantially injurious to consumers. As a result of Defendants' knowing, intentional concealment and/or omission of the turbocharger defect and associated safety hazard in violation of the UCL, Plaintiff Kimball and members of the California Class suffered damages to be determined at trial.  Owners of class vehicles also suffered

an ascertainable loss in the form of, *inter alia*, out-of-pocket costs for diagnosis and repair or replacement of the defective turbocharger, loss of the benefit of the bargain and diminished value of their vehicles as a result of Defendants' unfair, unlawful, and fraudulent acts and practices in the course of its business.

163.    Defendants knowingly and willfully engaged in the unfair, unlawful, and fraudulent business practices alleged in this complaint.  Defendants unconscionably marketed class vehicles to uninformed consumers in order to maximize profits by selling additional class vehicles incorporating the undisclosed defect and corresponding safety hazard.

164.    Defendants' unfair, unlawful, and fraudulent acts and practices harmed and continue to harm Plaintiff Kimball and members of the California Class, have negatively affected the public interest, and present a continuing safety hazard to Plaintiff Kimball and members of the California Class.

165.    Plaintiff and members of the California Class seek an order enjoining Defendants' unfair, unlawful, and fraudulent practices and award costs, attorneys' fees and restitution, disgorgement of funds and any other just and proper relief available under the UCL and California law.

## COUNT III

### VIOLATION OF THE SONG–BEVERLY CONSUMERS WARRANTY ACT, CAL. CIV. CODE § 1791 *ET SEQ.* (ON BEHALF OF PLAINTIFF KIMBALL AND THE CALIFORNIA CLASS)

166.    Plaintiff Kimball incorporates and re–alleges each preceding paragraph as though fully set forth here.

167.    Plaintiff Kimball asserts this count on behalf of herself and members of the California Class.

168.    Class vehicles are "consumer goods" within the meaning of CAL. CIV. CODE §1791(a).

169.    Defendants are "manufacturers" of class vehicles within the meaning of CAL. CIV. CODE §1791(j).

170.    Defendants impliedly warranted to Plaintiff and the California Class members that class vehicles were "merchantable" within the meaning of CAL. CIV. CODE §§1791.1(a) and 1792. Class vehicles do not have the quality that a buyer would reasonably expect.

171.    CAL. CIV. CODE § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

> (1) Pass without objection in the trade under the contract description;
>
> (2) Are fit for the ordinary purposes for which such goods are used;
>
> (3) Are adequately incorporated, packaged, and labeled; and,
>
> (4) Conform to the promises or affirmations of fact made on the container or label.

172.    Plaintiff Kimball and members of the California Class purchased class vehicles manufactured by the Defendants from the Defendants and/or through their authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of class vehicles when bought from a third party.  At all relevant times, Defendants were the manufacturer, distributor, warrantor and/or seller of class vehicles.  Defendants knew or had reason to know of the specific use for which class vehicles were purchased.

173.    Defendants provided Plaintiff Kimball and members of the California Class with one or more express warranties.  For illustrative purposes, Defendants currently provide: (1) a New Vehicle Limited Warranty which includes "virtually bumper to bumper coverage for 3 years or

36,000 miles, whichever occurs first," or 4 years or 50,000 miles, whichever occurs first, or 6 years or 72,000 miles, whichever occurs first; and/or (2) a Powertrain Limited Warranty for "5 years or 60,000 miles," which covers "all internal [engine] parts" including the turbocharger. Under warranties provided to members of the classes, Defendants promised to repair or replace covered defective engine components arising out of defects in materials and/or workmanship, including the turbocharger, at no cost to owners of the class vehicles. Given the latent nature of the turbocharger defect, Defendants knew or should have known that the majority of turbocharger failures occur outside the warranty periods.

174.    Plaintiff Kimball and members of the California Class experienced the turbocharger defect within the warranty periods but Defendants failed to inform Plaintiff Kimball and members of the California Class of the existence of the turbocharger defect and associated safety hazard and failed to provide a suitable repair or replacement of the turbocharger free of charge within a reasonable time.

175.    Defendants impliedly warranted that class vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

176.    Class vehicles, when sold and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. Class vehicles contain an inherent defect – the turbocharger defect – (at the time of sale and thereafter) and present an undisclosed safety risk to drivers and occupants. Defendants breached the implied warranty of merchantability.

177.    Through their maintenance schedules, Defendants represented that the defective turbocharger would not need periodic inspection, repair, or replacement before 110,000 miles and/or fraudulently concealed the need for periodic inspection, repair, or replacement of the

turbocharger before 110,000 miles by omitting the turbocharger from the maintenance schedules. Defendants cannot disclaim their implied warranty as they knowingly sold a defective product.

178.     Defendants were provided notice of the turbocharger defect by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA, and through their own testing.  Affording Defendants a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile here because Defendants have known of and concealed the turbocharger defect and, on information and belief, have refused to repair or replace the turbocharger free of charge within a reasonable time.

179.     Defendants breached their express and/or implied warranties in violation of CAL. CIV. CODE § 1791 *et seq*.

180.     As a direct and proximate result of Defendants breach of their express and/or implied warranties, Plaintiff Kimball and members of the California Class have been damaged in an amount to be determined at trial.

181.     Plaintiff Kimball and members of the California Class have been excused from performance of any warranty obligations as a result of Defendants' conduct described in this complaint.

182.     Plaintiff Kimball and members of the California Class seek actual damages, costs, attorneys' fees, and statutory damages as a result of Defendants' willful conduct alleged in this complaint.  Plaintiff Kimball and members of the California Class also seek reimbursement, replacement of the defective turbocharger, and/or the revocation of the purchase of the class vehicles, and all other relief available under CAL CIV. CODE § 1794.

183.     The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or Defendants' fraudulent concealment.

## COUNT IV

### FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT
### (ON BEHALF OF PLAINTIFF KIMBALL AND THE CALIFORNIA CLASS,
### OR ALTERNATIVELY, THE NATIONWIDE CLASS)

184.    Plaintiff Kimball incorporates and re-alleges each preceding paragraph as though fully set forth here.

185.    Plaintiff Kimball asserts this count on behalf of herself and members of the California Class.

186.    Defendants intentionally and knowingly concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of class vehicles and the fact that class vehicles contain a turbocharger defect and corresponding safety risk, with the intent that Plaintiff Kimball and members of the California Class rely on Defendants' omissions.  As a direct result of Defendants' fraudulent conduct, Plaintiff Kimball and members of the California Class have suffered actual damages.

187.    Defendants knew (at the time of sale and thereafter) that class vehicles incorporated the turbocharger defect, concealed the turbocharger defect and never intended to repair or replace the turbocharger during the warranty periods.  To date, Defendants have not provided Plaintiff Kimball and members of the California Class with a repair or remedy for the turbocharger defect.

188.    Defendants owed a duty to disclose the turbocharger defect and its corresponding safety risk to Plaintiff Kimball and members of the California Class because Defendants possessed superior and exclusive knowledge concerning the defect.  Defendants had a duty to disclose any information relating to the safety, quality, functionality, and reliability of class vehicles because they consistently marketed class vehicles as safe.

189.   Once Defendants made representations to the public concerning class vehicle safety, quality, functionality, and reliability, Defendants were under a duty to disclose these omitted facts, because where one does speak, one must speak the whole truth and not conceal any facts which materially qualify facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.  Rather than disclose the defect, Defendants intentionally and knowingly concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of class vehicles and the presence of the turbocharger defect and corresponding safety risk, to sell additional class vehicles and avoid the cost of repair or replacement.

190.   The turbocharger defect is material to Plaintiff Kimball and members of the California Class because Plaintiff Kimball and members of the California Class had a reasonable expectation that class vehicles would not contain a defect, such as the turbocharger defect, that leads to exorbitant repair costs and exposes them and other vehicle occupants to a safety risk.  No reasonable consumer expects a vehicle to contain a concealed defect in design, manufacture, materials, or workmanship, such as the turbocharger defect, that can lead to thousands of dollars in repair or replacement costs, and can cause catastrophic engine failure with little to no warning or time to take preventative measures or safely remove the vehicle from the road.

191.   Plaintiff Kimball and members of the California Class would not have purchased class vehicles but for Defendants' omissions and concealment of material facts concerning the nature and quality of class vehicles and existence of the turbocharger defect and corresponding safety risk, or would have paid less for the class vehicles.

192.   Defendants knew their concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts.  Defendants knew their

concealment and suppression of the turbocharger defect would sell more class vehicles and would discourage Plaintiff Kimball and members of the California Class from seeking replacement or repair of the turbocharger defect during the applicable warranty periods.  Defendants intended to induce Plaintiff Kimball and members of the California Class into purchasing class vehicles and to discourage them from seeking replacement or repair of the turbocharger defect in order to decrease costs and increase profits.

193.    Defendants acted with malice, oppression, and fraud.

194.    Plaintiff Kimball and members of the California Class reasonably relied upon Defendants' knowing concealment and omissions.  As a direct and proximate result of Defendants' omissions and active concealment of material facts concerning the turbocharger defect and associated safety risk, Plaintiff Kimball and members of the California Class suffered actual damages in an amount to be determined at trial.

**COUNT V**

**NEGLIGENT MISREPRESENTATION**
**(ON BEHALF OF PLAINTIFF KIMBALL AND THE CALIFORNIA CLASS,**
**OR ALTERNATIVELY, THE NATIONWIDE CLASS)**

195.    Plaintiff Kimball incorporates and re-alleges each preceding paragraph as though fully set forth here.

196.    Plaintiff Kimball asserts this count on behalf of herself and members of the California Class.

197.    Defendants owed a duty to disclose the turbocharger defect and its corresponding safety risk to Plaintiff Kimball and members of the California Class because Defendants possessed superior and exclusive knowledge concerning the turbocharger defect and the risks associated with the turbocharger's failure.  Defendants also made partial disclosures concerning the safety of class

vehicles while knowing that class vehicles possessed the turbocharger defect and failed to disclose its existence and its corresponding safety hazard.

198.   Defendants negligently misrepresented and omitted material facts including the standard, quality, or grade of class vehicles and the fact that the turbocharger installed in class vehicles is defective and prone to premature failure, exposing drivers, occupants, and members of the public to safety risks.  As a direct result of Defendants' negligent conduct, Plaintiff Kimball and members of the California Class suffered actual damages.

199.   As a result of Defendants' failure to disclose, in owners' manuals, maintenance schedules, or elsewhere, to Plaintiff Kimball and members of the California Class the material fact that the class engine turbocharger is defective and prone to premature failure, owners of class vehicles are required to spend thousands of dollars to repair or replace the turbocharger, other engine parts, and/or the entire engine, or sell their vehicles at a substantial loss.  The fact that the class engine turbocharger is prone to premature failure is material because no reasonable consumer expects that he or she will have to spend thousands of dollars for diagnosis, repair or replacement of the turbocharger before the end of the useful life of the engine, and because Plaintiff Kimball and members of the California Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the turbocharger that would present a safety risk.

200.   The fact that the class engine turbocharger is prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death.  When the turbocharger fails, drivers may be unable to accelerate or maintain speed or may experience catastrophic engine failure.  Drivers and occupants of class vehicles are at risk for rear-end collisions or other accidents caused by the inability to maintain an appropriate speed, and the general public is also at risk for being involved in an accident with a class vehicle that

suddenly stops or is unable to maintain an appropriate speed.  No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials, or workmanship, such as the turbocharger defect, that can cause catastrophic engine failure with little to no warning or time to take preventative measures or safely remove the vehicle from the road.

201.    Plaintiff Kimball and members of the California Class would not have purchased class vehicles but for Defendants' negligent omissions of material facts concerning the nature and quality of class vehicles and existence of the turbocharger defect and corresponding safety risk, or would have paid less for the class vehicles.  Plaintiff Kimball and members of the California Class justifiably relied upon Defendants' negligent false representations and omissions of material facts.

202.    As a direct and proximate result of Defendants' negligent false representations and omissions of material facts concerning the standard, quality, or grade of the class vehicles, and/or the turbocharger defect, Plaintiff Kimball and members of the California Class suffered an ascertainable loss and actual damages in an amount to be determined at trial.

**COUNT VI**

**BREACH OF EXPRESS WARRANTY**
**(ON BEHALF OF PLAINTIFF KIMBALL AND THE CALIFORNIA CLASS,**
**OR ALTERNATIVELY, THE NATIONWIDE CLASS)**

203.    Plaintiff Kimball incorporates and re-alleges each preceding paragraph as though fully set forth here.

204.    Plaintiff Kimball asserts this count on behalf of herself and members of the California Class.

205.    Defendants were and are at all relevant times a "merchant" with respect to motor vehicles under CAL. COM. CODE §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

206.    Class vehicles are and were at all relevant times "goods" within the meaning of CAL. COM. CODE §§ 2105(1) and 10103(a)(8).

207.    Defendants provided Plaintiff Kimball and members of the California Class with one or more express warranties.  For illustrative purposes, Defendants currently provide: (1) a New Vehicle Limited Warranty which includes "virtually bumper to bumper coverage for 3 years or 36,000 miles, whichever occurs first," or 4 years or 50,000 miles, whichever occurs first, or 6 years or 72,000 miles, whichever occurs first; and/or (2) a Powertrain Limited Warranty for "5 years or 60,000 miles," which covers "all internal [engine] parts" including the turbocharger.   Under express warranties provided to members of the class, Defendants promised to repair or replace covered defective engine components arising out of defects in materials and/or workmanship, including the turbocharger, at no cost to owners of the class vehicles.  However, given the latent nature of the turbocharger defect, Defendants knew or should have known that the majority of turbocharger failures occur outside the warranty periods.

208.    Defendants represented in the maintenance schedules and warranty guides for class vehicles that there would be no need to inspect, repair, replace, or service the turbocharger prior to 110,000 miles.  Such representations formed the basis of the bargain in Plaintiff Kimball and members of the California Class' decisions to purchase the class vehicles.

209.    Defendants also marketed class vehicles as high quality, reliable, and safe vehicles and that Defendants would stand behind the quality of their products and promptly repair any defects.   These statements helped conceal the existence of the turbocharger defect and its corresponding safety risk from Plaintiff Kimball and members of the California Class.

210.    In connection with the purchase each of the class vehicles, Defendants provided maintenance schedules and warranty guides which omit any mention of the turbochargers as requiring routine inspection, service, or replacement within the first 110,000 miles.

211.    Under the express warranties provided to Plaintiff Kimball and members of the California Class, Defendants promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the turbocharger defect, at no cost to owners of class vehicles and within a reasonable time.  As alleged in this complaint, Defendants breached its express warranties.

212.    Defendants' express warranties formed a basis of the bargain that was reached when Plaintiff Kimball and members of the California Class purchased their respective class vehicles.  Given the latent nature of the turbocharger defect, Defendants knew or should have known that the majority of the turbocharger failures (and corresponding engine damage) occur outside of the warranty periods.

213.    Plaintiff Kimball and members of the California Class experienced the existence of the turbocharger defect within the warranty periods but had no knowledge of the existence of the turbocharger defect and associated safety risk, which were known and concealed by Defendants. Despite the existence of the express warranties, Defendants failed to adequately inform Plaintiff Kimball and members of the California Class that class vehicles incorporated the turbocharger defect and failed to provide a suitable repair or replacement of the turbocharger free of charge within a reasonable time.

214.    Defendants breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied.

215.   On information and belief, Defendants have not suitably repaired or replaced the defective turbocharger free of charge for Plaintiff Kimball and members of the California Class despite the existence of the turbocharger defect in class vehicles at the time of sale.

216.   Defendants further breached their express warranties by selling class vehicles that were defective with respect to engine materials, workmanships, design and manufacture, and were accompanied by an owner's manual and/or maintenance schedule that incorporated no inspection and service materials for the turbocharger for the first 110,000 miles although Defendants knew of the turbocharger defect and that the turbocharger required periodic inspection and service.

217.   Class vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because the engine materials, workmanship, design and/or manufacturing defects which cause engine failure and/or failure to perform as warranted.

218.   Plaintiff Kimball and members of the California Class had sufficient direct dealings with Defendant and their agent, their authorized dealerships, to establish privity of contract between Defendants, on the one hand, and Plaintiff Kimball and members of the California Class, on the other hand.  Nonetheless, privity is not required here because Plaintiff Kimball and each of the other members of the California Class are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of their warranties.  The dealers were not intended to be the ultimate users of class vehicles and have no rights under the warranty agreements provided with the class vehicles; the warranty agreements were designed for and intended to benefit purchasers of class vehicles only.

219.   Defendants were provided notice of the turbocharger defect by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA and through their own testing.  Affording Defendants a reasonable opportunity to cure their breach of written

warranties would be unnecessary and futile here because Defendants have known of and concealed the turbocharger defect and have failed to provide a suitable repair or replacement of the defective turbocharger free of charge within a reasonable time.

220.    Defendants were provided notice by letter on May 2, 2022 that Plaintiff would pursue claims related to the turbocharger defect on behalf of a class.  Plaintiff Kimball also provided notice by presenting her Audi A5 for repair to Sonnen Motorcars on July 23, 2019 in San Rafael, California.  Sonnen Motorcars is an authorized dealer of Defendants and its duly authorized agent to perform warranty repairs.  Despite this notice, Defendants did not cure their breach of express warranties and failed to provide a suitable repair or replacement of the defective turbocharger free of charge within a reasonable time.

221.    Any attempt by Defendants to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here.   Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers of the turbocharger defect.  The time limits incorporated in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiff Kimball and members of the California Class.  Plaintiff Kimball and members of the California Class did not determine these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Defendants and members of the California Class, and Defendants knew or should have known that class vehicles were defective at the time of sale and that the turbocharger defect posed a safety risk.

222.    The limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Kimball

and members of the California Class whole because, on information and belief, Defendants failed and/or have refused to adequately provide the promised remedies within a reasonable time.

223.    Defendants knew that class vehicles were inherently defective and did not conform to their warranties and Plaintiff Kimball and members of the California Class were induced to purchase class vehicles under false and/or fraudulent pretenses.

224.    Plaintiff Kimball and members of the California Class experienced the existence of the turbocharger defect within the warranty periods but had no knowledge of the existence of the turbocharger defect which was known and concealed by Defendants.  Despite the existence of express warranties, Defendants failed to inform Plaintiff Kimball and members of the California Class that class vehicles incorporated the turbocharger defect during the warranty periods and wrongfully transferred the costs of repair or replacement of the turbocharger and damaged engine Plaintiff Kimball and members of the California Class.

225.    Because of the turbocharger defect, class vehicles are not reliable and owners of these vehicles have lost confidence in the ability of class vehicles to perform the function of safe, reliable transportation.

226.    Plaintiff Kimball and members of the California Class could not have reasonably discovered the turbocharger defect.

227.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiff Kimball and members of the California Class have been damaged in an amount to be determined at trial.

228.    Finally, because Defendants' breach of express warranty as set forth in this complaint, Plaintiff Kimball and members of the California Class assert, as additional and/or alternative remedies, the revocation of acceptance of goods and the return to Plaintiff Kimball and

members of the California Class of the purchase price of all class vehicles currently owned, and for such other incidental and consequential damages as allowed.

## COUNT VII

### BREACH OF IMPLIED WARRANTY
### (ON BEHALF OF PLAINTIFF KIMBALL AND THE CALIFORNIA CLASS, OR ALTERNATIVELY, THE NATIONWIDE CLASS)

229.    Plaintiff Kimball incorporates and re-alleges each preceding paragraph as though fully set forth here.

230.    Plaintiff Kimball asserts this count on behalf of herself and members of the California Class.

231.    Plaintiff Kimball and members of the California Class purchased class vehicles, manufactured by Defendants, from Defendants, by and through its authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of class vehicles when bought from a third party.  At all relevant times, Defendants were the manufacturer, distributor, warrantor, and/or seller of class vehicles.  Defendants knew or had reason to know of the specific use for which class vehicles were purchased.

232.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under CAL. COM. CODE §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under §2103(1)(d).

233.    Class vehicles are and were at all relevant times "goods" within the meaning of CAL. COM. CODE §§ 2105(1) and 10103(a)(8).

234.    Class vehicles are and were at all relevant times "goods" within the meaning of CAL. COM. CODE §§ 2105(1) and 10103(a)(8).

235.    A warranty that class vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to CAL. COM. CODE §§ 2314 and 10212.

236.    Class vehicles, when sold and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation.  Class vehicles contain an inherent defect—the turbocharger defect—(at the time of sale and thereafter) and present an undisclosed safety risk to drivers and occupants.  Defendants breached the implied warranty of merchantability.

237.    Through their maintenance schedules, Defendants further represented the turbocharger would not need periodic inspection, repair, or replacement before 110,000 miles and/or fraudulently concealed the need for periodic inspection, repair, or replacement of the turbocharger before 110,000 miles by omitting the turbocharger from the maintenance schedules. Defendants cannot disclaim their implied warranty as they knowingly sold a defective product.

238.    Plaintiff Kimball and members of the California Class had sufficient direct dealings with Defendants or their agents, their authorized dealerships, to establish privity of contract between Defendants, on the one hand, and Plaintiff Kimball and members of the California Class, on the other hand.  Nonetheless, privity is not required here because Plaintiff Kimball and each of the other members of the California Class are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of their implied warranties.  The dealers were not intended to be the ultimate users of class vehicles and have no rights under the warranty agreements provided with the class vehicles; the warranty agreements were designed for and intended to benefit purchasers of class vehicles only.

239.    Defendants were provided notice of the turbocharger defect by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA, and through their

own testing.  Affording Defendants a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile here because Defendants have known of and concealed the turbocharger defect and, on information and belief, have refused to repair or replace the defective turbocharger free of charge within a reasonable time.

240.    Defendants were provided notice by a letter on May 2, 2022 that Plaintiff would pursue claims related to the turbocharger defect on behalf of a class.  Plaintiff Kimball also provided notice by presenting her Audi A5 for repair to Sonnen Motorcars on July 23, 2019 in San Rafael, California.  Sonnen Motorcars is an authorized dealer of Defendants and its duly authorized agent to perform warranty repairs.  Despite this notice, Defendants did not cure their breach of implied warranties and failed to provide a suitable repair or replacement of the defective turbocharger free of charge within a reasonable time.

241.    Any attempt by Defendants to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers of the turbocharger defect.  The time limits incorporated in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiff Kimball and members of the California Class.  Plaintiff Kimball and members of the California Class did not determine these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Defendants and members of the California Class, and Defendants knew or should have known that class vehicles were defective at the time of sale and that the turbocharger defect posed a safety risk.

242.    Plaintiff Kimball and members of the California Class have been excused from performance of any warranty obligations as a result of Defendants' conduct described in this complaint.

243.    The applicable statutes of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

244.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff Kimball and members of the California Class have been damaged in an amount to be demonstrated at trial.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Kimball, on behalf of herself and all others similarly situated, respectfully requests that this Court enter judgment against Defendants and in favor of herself and the respective class and/or subclass(es), and award the following relief:

a.    An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff Kimball as the representatives of the class and California Class, and Plaintiff Kimball's counsel as counsel for the class and California Class;

b.    An order awarding declaratory relief and enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged in this complaint;

c.    Injunctive and equitable relief in the form of a comprehensive program to repair or replace the turbocharger in all class vehicles, and/or buyback all class vehicles, and to fully reimburse and make whole all members of the California Class for all costs and economic losses;

d.    Appropriate injunctive and equitable relief;

e.    A declaration that Defendants are financially responsible for all class notice and the administration of class relief;

f.  An order awarding costs, restitution, disgorgement, punitive damages, treble damages, and exemplary damages under applicable law, and compensatory damages for economic loss, overpayment damages, and out-of-pocket costs in an amount to be determined at trial;

g.  An order awarding any applicable statutory and civil penalties;

h.  A declaration that Defendants are required to engage in corrective advertising;

i.  An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

j.  An award of costs, expenses, and attorneys' fees as permitted by law; and

k.  Such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Respectfully submitted,

*s/ Gary S. Graifman*

Gary S. Graifman
**KANTROWITZ GOLDHAMER &
GRAIFMAN, P.C.**
135 Chestnut Ridge Road
Montvale, New Jersey 07645
Telephone: (201) 391-7000
ggraifman@kgglaw.com

**THOMAS P. SOBRAN, P.C.**
Thomas P. Sobran (*pro hac vice* motion to be filed)
7 Evergreen Lane
Hingham, MA 02043
Telephone: (781) 741-6075
tsobran@sobranlaw.com

DATED: June 20, 2022